803 So.2d 76 (2001)
Henry and Gloria PARKER, individually and on behalf of their minor child, Shalana Parker
v.
Dr. Donald HARPER.
No. 01-0548.
Court of Appeal of Louisiana, Third Circuit.
October 31, 2001.
*78 James A. Gray, II, Cheryl A. Gray, Gray & Gray, New Orleans, LA, Counsel for Plaintiffs/Appellants Henry Parker and Gloria Parker.
Janice M. Reeves, Charles J. Boudreaux, Jr., Onebane, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, LA, Counsel for Defendant/Appellee Dr. Donald Harper.
Court composed of ULYSSES GENE THIBODEAUX, JIMMIE C. PETERS and MICHAEL G. SULLIVAN, Judges.
THIBODEAUX, Judge.
Henry and Gloria Parker, plaintiffs, filed suit individually and on behalf of their minor child, Shalana, against defendant, Dr. Donald Harper, for injuries allegedly caused by Dilantin, a drug prescribed by Dr. Harper to treat Shalana's seizures. Mr. and Mrs. Parker claimed two separate theories of medical malpractice, namely, breach of the medical standard of care and lack of informed consent. Dr. Harper moved for summary judgment, which was granted by the trial judge on both issues. The Parkers appeal. We affirm the summary judgment on the issue of standard of care and reverse on the issue of informed consent.

*79 I.

ISSUES
In connection with one another, we shall consider plaintiffs' issues for review, namely, whether the trial court erred in:
(1) not properly applying the doctrine of informed consent;
(2) not considering the affidavit of a certified pharmacist as an expert who could define the existence and nature of a risk and the likelihood of occurrence of the risk;
(3) determining that no genuine issue of material fact existed; and,
(4) admitting and relying upon a supplemental affidavit of a physician in reaching its conclusion.

II.

FACTS AND PROCEDURAL HISTORY
On April 29, 1987, Henry and Gloria Parker took their minor child, Shalana, to a neurology and psychopharmacology specialist, Dr. Donald Harper, for evaluation after becoming aware that Shalana was experiencing daily seizures. The seizures were mild, lasting two to fifteen seconds per occurrence and two to eight times per day. At the conclusion of this first visit, Dr. Harper prescribed Depakote 250 mg and arranged for an EEG. Between April 1987 and June 1993, Shalana met with Dr. Harper eleven times. Over the course of these visits, Dr. Harper increased Shalana's Depakote dosage, provided Tegretol as a Depakote substitute, and added Diamox. These measures proved ineffective. In June 1993, Dr. Harper prescribed Dilantin 100 mg to be taken thrice daily. Dr. Harper testified in his deposition that he specifically remembered telling Mr. and Mrs. Parker about the toxicity of the drug and its build-up in the body. He also remembered instructing the Parkers to be in contact with him over the course of the following one to two weeks to discuss Shalana's progress.
Later that same month, Shalana developed a rash on her face. The rash spread to various parts of her body and was accompanied by high fever. She was immediately hospitalized with "red eye." Her diagnosis was a possible drug reaction, Stevens-Johnson syndrome, or a varicella virus infection. Dr. Harper visited her twice while she was hospitalized and claims that he discussed her condition with Mrs. Parker and told both the Parkers that Shalana should be placed back on Depakote. As a result of this illness, Shalana has lost complete vision in one eye, has lost partial vision in the other, and has sustained permanent scarring on her body.
Mr. and Mrs. Parker claim that they were neither informed of any possible side effects of Dilantin or the risks associated therewith, nor were they asked to sign a medical consent form. They allege further that they were never informed about Stevens-Johnson syndrome. Dr. Harper claims that he did inform the family of the drug's risks, as evidenced by Shalana's medical charts.
The Parkers filed a medical malpractice claim against Dr. Harper, alleging both breach of the medical standard of care for improperly prescribing Dilantin and failure to inform them of the potential side effects and the warning signs of the drug. These are two separate theories of medical malpractice.
Because Dr. Harper is a qualified health care provider, plaintiffs' claims were submitted to a medical review panel. The affidavits of the three members of the medical review panel, Drs. Thor E. Borresen, Steven J. Cavalier, and Leslie R. Hightower, uniformly swear that Dr. Harper did not breach the applicable standard of care because Dilantin was an appropriate *80 drug to use on Shalana in this situation. They swear further that the medical records support the fact that Dr. Harper did discuss potential drug toxicity with the patient and that once a problem was reported, appropriate care was taken. Neurologist Dr. Robert D. Martinez agrees with the findings of the panel in his affidavit, namely, that there was no deviation from the standard of care applicable to Dr. Harper. He also swears that Dr. Harper discussed the pros and cons of Dilantin with Mrs. Parker and that drug reactions such as Stevens-Johnson syndrome are both rare and unpredictable. Dr. Harper also attaches portions of his own deposition to the motion for summary judgment.
Plaintiffs offer their own affidavits in which they both swear that Dr. Harper did not discuss the possible side effects of Dilantin and that they would not have assumed the risks associated with Dilantin. They swear further that Dr. Harper did not explain to the couple the warning signs of an adverse reaction to the drug and that, as such, they were not put on notice to be conscious of a potential adverse reaction. Plaintiffs also attach the affidavit of registered pharmacist Alvin Stewart who swears that Stevens-Johnson syndrome is a possible side effect and known risk of taking Dilantin. Attached to his affidavit are the index sheet for Dilantin and two articles from medical journals which indicate, according to him, that Stevens-Johnson syndrome is a possible side effect of the drug and that the spectrum of skin rashes occurs in two to five percent of Dilantin users. Also attached are Dr. Arthur N. McCallum's discharge summary, Dr. Firooz Jalili's consultation report, and excerpts from Dr. Harper's deposition.

III.

LAW AND DISCUSSION
We begin with the well-settled rule that "[a]ppellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate." Reynolds v. Select Properties, Ltd., 93-1480 (La.4/11/94); 634 So.2d 1180, 1183; Leger v. Louisiana Med. Mut. Ins. Co., 98-1098 (La.App. 3 Cir. 3/31/99); 732 So.2d 654, 657, writ denied, 99-1253 (La.6/18/99); 745 So.2d 30. The burden of persuasion remains always with the movant.
According to La.R.S. 9:2794(A), the plaintiff bears the burden in a breach of the medical standard of care case. The burden is three pronged. He must first prove the degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians licensed in Louisiana and actively practicing in a similar community or locale and under similar circumstances. Still in connection with the first prong, he must also show the location where the defendant practices in a particular specialty and where the alleged acts of negligence raise issues peculiar to that specialty, then prove the degree of care ordinarily practiced by physicians within that specialty. The second prong requires the plaintiff to prove that the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence along with his best judgment in the application of that skill. Third, causation must be proven, namely, that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care, plaintiff suffered injuries that he would not have otherwise suffered.
As in a case alleging breach of the medical standard of care, the plaintiff in an informed consent case bears the burden of proof. He must show: (1) the existence of a material risk which the physician must *81 disclose, (2) the failure of the physician to inform the patient of a material risk, (3) the realization of the material risk, and (4) a causal connection between the failure to inform the patient of the risk and realization of the risk. Hondroulis v. Schuhmacher, 612 So.2d 859 (La.App. 4 Cir.1992) (citing Hondroulis v. Schuhmacher, 553 So.2d 398 (La.1988)); Leger, 732 So.2d 654; Ardoin v. Murdock, 97-1468 (La.App. 3 Cir. 4/15/98); 711 So.2d 837, writ denied, 98-1362 (La.7/2/98); 724 So.2d 734; Guidry v. Neu, 97-810 (La.App. 3 Cir. 12/10/97); 708 So.2d 740.
As set out in La.Code Civ.P. art. 966(C)(1) and (2), a judgment granting Dr. Harper's motion is proper as a matter of law if there is no genuine issue as to material fact. Because Dr. Harper is not to bear the burden of proof at trial on either the breach of the standard of care issue or the informed consent issue, he is not required to negate all essential elements of the plaintiffs' claims. He must show an absence of factual support for one or more elements essential to the claims of Mr. and Mrs. Parker. If Dr. Harper is successful on this front, then the burden of production shifts to the plaintiffs to produce factual support sufficient to establish that they will be able to satisfy their evidentiary burden of proof at trial. If the plaintiffs are successful on their front, then there is a genuine issue of material fact. We will now separately consider the appropriateness of summary judgment rendered in connection with each of plaintiffs' claims.

Breach of the Medical Standard of Care
Attached to Dr. Harper's motion for summary judgment are the medical review panel's decision, the affidavits of the doctors who participated in the decision, an affidavit and supplemental affidavit from neurologist Dr. Martinez, and portions of Dr. Harper's deposition. It is well established that the opinion of a medical review panel is admissible as expert evidence in a malpractice suit. Richoux v. Tulane Med. Ctr., 617 So.2d 13 (La.App. 4 Cir.1993); Derouen v. Kolb, 397 So.2d 791 (La.1981). Attached to plaintiffs' motion in opposition are an affidavit from pharmacist Alvin Stewart attached to which are two articles from medical journals as well as the index sheet for the drug Dilantin, affidavits from both Mr. and Mrs. Parker, excerpts from Dr. Harper's deposition, Dr. McCallum's discharge summary, and Dr. Jalili's consultation report.
Plaintiffs do not rebut the grant of summary judgment on the breach of the standard of care to any significant degree. They remain largely silent on the issue, pointing to La.R.S. 9:2794 as the source of evidentiary standards for breach cases and to Hondroulis for the evidentiary standards for informed consent cases. And while we agree with these directives, we do not agree, as plaintiffs suggest, that the trial court combined the elements of proof for the two theories when granting the motion for summary judgment.
Defendant's affidavits of the doctors who comprised the medical review panel, as well as that of Dr. Martinez, all declare that Dr. Harper did not breach the medical standard of care in connection with his neurological treatment of Shalana. Dr. Harper has, therefore, presented a prima facie case of an absence of support for one or more elements essential to this theory of breach of the standard of care. None of the documents attached to plaintiffs' motion in opposition in any way suggest otherwise. The plaintiffs have not produced factual support sufficient to establish that they will be able to satisfy their evidentiary burden of proof at trial on the issue of breach of the medical standard of care. As such, the trial court was justified in *82 granting the motion for summary judgment on the issue of breach of the standard of care, as guided by La.Code Civ.P. art. 967, which clearly states that:
Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto and served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or by further affidavits.
When a motion for summary judgment is made and supported as provided above, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him. (Emphasis ours).

Informed Consent
Dr. Harper contends that informed consent procedures, as outlined by statute and the jurisprudence, need not be applied in this case because such consent is only required for surgery and other similar medical procedures and is not required for routine medical practices. Novak v. Texada, Miller, Masterson, & Davis Clinic, 514 So.2d 524 (La.App. 3 Cir.), writ denied, 515 So.2d 807 (La.1987) (administration of a flu inoculation); Daniels v. State Dep't of Health & Human Res., 532 So.2d 218 (La.App. 3 Cir.1988) (non-surgical treatment of a wrist fracture). We dispense with this contention presently, as we do not believe that the administration of an anti-seizure drug such as Dilantin is a routine medical practice. Such administration cannot rightfully be grouped with the administration of a flu inoculation or the non-surgical treatment of a wrist fracture.
The Louisiana statutory directives on informed consent are contained in the Uniform Consent Law, found at La.R.S. 40:1299.40, which reads in part:
A. (1) Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which: sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
. . . .
C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for *83 such patient shall include the matters set forth in Paragraph (1) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases. (Emphasis ours).
Shalana has suffered disfiguring scars along with lost and impaired vision, thus making the statute applicable and entitling plaintiffs to informed consent. A presumption of proper consent may be rebutted if the plaintiff establishes certain factors. Though these factors have been stated slightly differently among the cases on the issue, they generally are: (1) the existence of a material risk which the physician must disclose, (2) the failure of the physician to inform the patient of a material risk, (3) the realization of the material risk, and (4) a causal connection between the failure to inform the patient of the risk and realization of the risk. Hondroulis, 612 So.2d 859; Leger, 732 So.2d 654; Ardoin, 711 So.2d 837; Guidry, 708 So.2d 740.
Because the plaintiffs bear this burden at trial, Dr. Harper is not required to negate all essential elements of the plaintiffs' claims. He must show an absence of factual support for one or more elements essential to the claims of Mr. and Mrs. Parker. Dr. Harper has failed to negate any essential elements to plaintiffs' informed consent case or, alternatively, Mr. and Mrs. Parker have established that they will be able to satisfy their evidentiary burden at trial. As such, we believe summary judgment is inappropriate on the issue of informed consent. This conclusion is based on our opinion that there are any number of material facts present, i.e., facts whose existence or nonexistence are essential to plaintiffs' case under their theory of recovery. Penalber v. Blount, 550 So.2d 577 (La.1989); Leger, 732 So.2d 654.
Our first inquiry is whether a material risk existed in this case. The physician's duty is to disclose all material risks and the test for materiality is dual pronged. As the court in Hondroulis explains:
The factors contributing significance to a medical risk are the incidence of injury and the degree of the harm threatened. If the harm threatened is great, the risk may be significant even though the statistical possibility of its taking effect is very small. But if the chance of harm is slight enough, and the potential benefits of the therapy or the detriments of the existing malady great enough, the risk involved may not be significant even though the harm threatened is very great.
The determination of materiality is a two-step process. The first step is to define the existence and nature of the risk and the likelihood of its occurrence. "Some" expert testimony is necessary to establish this aspect of materiality because only a physician or other qualified expert is capable of judging what risk exists and the likelihood of occurrence. The second prong of the materiality test is for the trier of fact to decide whether the probability of that type harm is a risk which a reasonable patient would consider in deciding on treatment. The focus is on whether a reasonable person in the patient's position probably would attach significance to the specific risk. This determination of materiality does not require expert testimony.
Hondroulis, 553 So.2d at 412. (Emphasis ours) (Citations omitted).
The excerpt from Hondroulis is significant to us for two reasons. First, it convinces us that a genuine issue of material *84 fact exists as to whether there was a material risk. Second, it convinces us that plaintiffs' affidavit from Mr. Stewart is sufficient for the purposes for which plaintiffs introduce it.
The harm threatened here was great, especially vis-a-vis the sporadic occurrence of mild seizures before Shalana's ingestion of Dilantin. Allegedly as a result of taking the drug, she sustained severe injuriesshe lost complete vision in one eye, has lost partial vision in the other, and has sustained permanent scarring on her body. And even though the statistical probability may have been small (Dr. Harper testified in deposition that the risks of Stevens-Johnson syndrome are remote), that does not make the risk any less significant. Moreover, the determination of materiality is a two-step process. The first is to define the existence and nature of the risk and the likelihood of its occurrence. "Some" expert testimony is necessary, that is, a physician or other qualified expert is capable of judging what risk exists and the likelihood of occurrence. Hondroulis, 553 So.2d 398. Plaintiffs attached the affidavit of Mr. Stewart, a licensed pharmacist in Louisiana, who, according to his affidavit, is "an expert in the science of drugs as it relates to medicinal uses." He asserts that "[a] known risk of Dilantin is the development of skin rashes, including Stevens-Johnson syndrome, which may be fatal. This spectrum of skin rashes occurs in 2-5% of users of Dilantin...." We note that in Guidry, 708 So.2d 740, our circuit found that a 0.001% (i.e., a one in one thousand) chance of the occurrence of endophthalmitis to be a material risk and therefore warranted disclosure.
Though we recognize that he is not a neurologist, the potential development of Stevens-Johnson syndrome is not peculiar to the practice of neurology. Mr. Stewart does not need to have treated patients with neurological problems to discuss the frequency of risks associated with Dilantin. His opinions represent to this court that he is an "other qualified expert" with regard to drugs and potential reactions thereto and is capable of judging what risk exists, its nature, and the likelihood of its occurrence. There would be a serious question as to the sufficiency of Mr. Stewart's affidavit if he were opining regarding Dr. Harper's compliance with a neurologist's standard of care. However, we do not view his affidavit as being employed for this purpose.
Because the harm was great in comparison to the possibility of the risk and because we are satisfied with the sufficiency of Mr. Stewart's affidavit, we find there is a genuine issue of material fact as to significance of the material risk. We are not swayed by Dr. Martinez's opinion that Mr. Stewart is not qualified to render an opinion on the existence and nature of the risk of Stevens-Johnson syndrome resulting from ingestion of Dilantin. There is some merit with Dr. Martinez's opinion that the existence and nature of the risk were not of such significance to require informed consent. Because his opinion raises questions when compared to that of Mr. Stewart, however, we find a genuine issue of material fact on the issue of risk.
The second prong of the materiality test belongs to the trier of fact and does not require expert testimony. "[T]he physician is required to disclose material risks in such terms as a reasonable doctor would believe a reasonable patient in the plaintiff's position would understand. Technical language will not ordinarily suffice to disclose a risk to an untutored layperson and abstract or blanket terms may not be adequate to communicate specific dangers." Hondroulis, 553 So.2d at 421. (Citations omitted). Deciding whether the probability of that type harm is a risk *85 which a reasonable patient would consider in deciding on treatment is highly improbable to show at the summary judgment stage and, therefore, presents another example of the presence of a genuine issue of material fact in this case. It is highly tenuous for anyone to swear to how he or she thinks an objective person would react when faced with the risk. This is appropriately suited for a trier of fact. In light of the above, Dr. Harper has failed to show lack of factual support for the first element of plaintiffs' case. In this court's collective mind, this issue is replete with fact questions.
Our second inquiry centers around whether Dr. Harper failed to inform the patient of the material risk. Dr. Harper claims that the four expert affidavits and the medical review panel opinion admissible under La.R.S. 40:1299.47(H) refute the plaintiffs' position that there was no informed consent of a material risk to Shalana. The physicians comprising the medical review panel swear that the medical records support the fact that Dr. Harper did discuss potential drug toxicity with the patient and that once a problem was reported, appropriate care was taken. Dr. Martinez also swore that Dr. Harper discussed the pros and cons of Dilantin with Mrs. Parker.
There is no evidence in the record to suggest that any of the four medical review panel doctors or Dr. Martinez were present when Dr. Harper allegedly informed the Parkers. Conversely, however, Mr. and Mrs. Parker both swear that Dr. Harper did not discuss the possible side effects of Dilantin and that they would not have assumed the risks of Dilantin. They swear further that Dr. Harper did not explain to the couple the warning signs of an adverse reaction to the drug and that, as such, they were not put on notice to be conscious of any potential adverse reaction. While we agree that the doctors do have sufficient knowledge to form opinions regarding Dr. Harper's alleged breach of the medical standard of care, they have no personal knowledge of Dr. Harper having informed the plaintiffs. If Shalana's charts contain notations of such consultation, then determinations as to the validity and authenticity of such notations are more appropriately left to the trier of fact. As such, we believe there is factual support that a genuine issue of material fact exists as to the plaintiffs' second element, whether the physician disclosed the material risk. This belief would maintain even if there were an affidavit from Dr. Harper stating that he had informed the Parkers.
Our next inquiry considers element three of plaintiffs' case. Here again, we believe that there is a genuine issue of material fact as to whether the material risk was realized. In the discharge summary from Lafayette General Medical Center by Dr. McCallum, Shalana was diagnosed as suffering from Stevens-Johnson syndrome. Dr. Harper testified in deposition that at the time Shalana was discharged, he believed that "more likely than not she had Stevens-Johnson syndrome." Moreover, Dr. Jalili, indicated in his consultation report to Dr. McCallum and others on February 24, 1993, that it was his impression that Shalana was suffering from Stevens-Johnson syndrome and that it was most likely related to the ingestion of Dilantin.
We are aware that Dr. McCallum's summary and Dr. Jalili's report are unsworn, unverified and unaccompanied by sworn affidavits. Such documents are not of sufficient evidentiary value to be given weight in determining whether there is a genuine issue of material fact. Richard v. Garber Bros., Inc., 90-1421 (La.App. 1 Cir. 10/7/94); 644 So.2d 682. However, nowhere *86 in Dr. Harper's attached papers does any affiant declare that Shalana did not have Stevens-Johnson syndrome, i.e., that the risk was not realized. To the contrary, Dr. Martinez's affidavit recognizes the possibility of developing the syndrome after ingesting an anti-epileptic drug such as Dilantin. The issue, therefore, remains unresolved.
Finally, as to the fourth element, the causal connection between failure to inform the patient of the risk and realization of the risk, we are satisfied that any question of causation is for the trier of fact and inappropriate at the summary judgment stage.
Based on the foregoing, we find that the disputed facts as to plaintiffs' informed consent case are neither patently insubstantial nor are they without substance. We find also that it is unnecessary to address the issue of the trial court's admission and reliance of Dr. Martinez's supplemental affidavit.

IV.

CONCLUSION
For the reasons assigned, the judgment appealed from is affirmed insofar as it grants the motion for summary judgment declaring no genuine issue of material fact as to Dr. Harper's alleged breach of the medical standard of care. The trial court judgment is reversed and set aside insofar as it grants judgment declaring no genuine issue of material fact as to the issue of informed consent.
AFFIRMED IN PART; REVERSED IN PART, AND REMANDED.